UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LISA SPRINGFIELD,                    )
                                     )
          Plaintiff,                 )
                                     )      No. 4:08CV01861 HEA/FRB
                                     )
     v.                              )
                                     )
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
          Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

I.   **Procedural Background**

          On January 20, 2006, plaintiff filed applications for
Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI"), alleging disability beginning May 31, 2005.
(Administrative Transcript ("Tr.") 97-104).  Plaintiff's
applications were denied on May 10, 2006, and on June 27, 2006, she
filed a request for a hearing before an administrative law judge
("ALJ"). (Tr. 49-51, 58).  On December 5, 2007, a hearing was held
before ALJ Randolph E. Schum.  (Tr. 26-48).  On January 27, 2008,

ALJ Schum issued his decision denying plaintiff's application for benefits. (Tr. 11-22).

Plaintiff subsequently filed a Request for Review of Hearing Decision/Order with defendant agency's Appeals Council. (Tr. 7). On October 17, 2008, the Appeals Council denied plaintiff's request for review. (Tr. 1-4). The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

During the administrative hearing, plaintiff was represented by attorney Jeffrey Bunten. Plaintiff testified that she was 38 years old, and that she had completed high school and a two-year computer specialist program at a business school. (Tr. 29). She testified that she had taken medication that morning, but that it did not interfere with her ability to answer questions or be alert. (Id.)

Plaintiff testified that she had worked as a correctional officer from approximately 1998 until 2006. (Tr. 29-30). She testified that she subsequently worked in public safety, a job she described as analogous to that of a police officer, involving "drug raids and confiscate narcotics, weapons, make arrests and terminate leases on all of Housing Authority properties." (Tr. 30). Plaintiff testified that she did not do any lifting in this job.

(Tr. 43).  She testified that she was on her feet most of the day, and developed plantar fasciitis in both heels.  (Id.)

Plaintiff testified that she currently weighed 275 pounds, and was five feet, seven inches tall.  (Tr. 31).  Plaintiff considered her normal weight to be 194 pounds, and stated that she has been overweight since she began taking her medication.  (Tr. 31-32).  Plaintiff testified that she smoked five cigarettes per day.  (Tr. 32).

Plaintiff testified that, in 2006, she collected unemployment after being laid off, and represented at that time that she was ready, willing and able to work, but that the unemployment office was going to find a job that allowed her to work sitting down.  (Tr. 30-31).  She testified that she did not feel she could still do that type of work, however, because she was unable to sit or stand for a long period of time.  (Tr. 32-33).  Plaintiff explained that she could not sit for long periods of time because of her "osteo-rheumatoid arthritis," "lumbago," and fibromyalgia.  (Tr. 33).  Plaintiff testified that she has had fibromyalgia for some time, but that her doctors did not know what it was, and that it had just been diagnosed last week.  (Id.)  Plaintiff testified that she had gone to the hospital during the preceding week because her doctors were worried she would harm herself or "harm these other doctors because [she] was real upset."  (Id.)  She stated that she was upset because she was mad at the doctors over an apparent disclosure of information to her mother.

-3-

(Tr. 34).

Plaintiff testified that her hypertension was controlled with medication, and that she last had an asthma attack six to eight months ago. (Tr. 35). Plaintiff testified that she had received psychiatric care from Dr. Melissa Swallow, who she had been seeing since 2002. (Tr. 35-36). When the ALJ noted that Dr. Swallow's records indicated that she had seen her in 2002, a couple of times in 2003, and again in 2006, plaintiff replied that she was upset "with those doctors" and had changed all of her doctors to "BJC" as a result.[1] (Tr. 36).

Plaintiff testified that she requested a walker in October of 2006 because she kept falling, and because she had "osteo-rheumatoid arthritis" in all of the joints of her body that caused her daily pain. (Tr. 36-37). Plaintiff testified that she acquired a wheelchair "a couple of years ago" because when she went out, she could not stand up. (Tr. 37). Plaintiff could not remember which doctor approved it. (Id.) She testified that she needed the walker to get around inside her home, and only used the wheelchair when she went out. (Id.)

Plaintiff testified that, when she went to Barnes hospital during the preceding week, she was diagnosed with major depression. (Tr. 38). The ALJ noted that plaintiff was still wearing her hospital arm bands. (Id.)

_____

[1]Dr. Swallow, however, is a BJC physician.

-4-

When questioned by her attorney, plaintiff testified that she saw Dr. John Metzler for pain management, and that Dr. Metzler conducted testing. (Tr. 38-39). Plaintiff testified that she had been taking Vicodin[2] for so long that it did not help her pain, but did not have any side-effects. (Tr. 39). Plaintiff testified that Flexeril[3] did not cause side effects. (Tr. 39-40). Plaintiff testified that she had multiple crying spells on a daily basis that lasted for 20 minutes. (Tr. 40). Plaintiff testified that she did not go anywhere, and that she bathed and changed her clothes every other day. (Tr. 40). She testified that she sometimes had suicidal thoughts, and that she also heard voices and also still suffered from flashbacks of the time she was involved in a shootout while working in law enforcement. (Tr. 41).

The ALJ then heard testimony from Dr. John McGowen, a vocational expert ("VE"). The ALJ asked Dr. McGowen to assume a hypothetical individual of plaintiff's age, education and work experience, who could lift and carry up to 20 pounds occasionally, ten pounds frequently; required a sit/stand option; and should be allowed to use a handheld device to ambulate when necessary; could occasionally climb stairs and ramps; never ropes ladders or

---

[2]Vicodin is a combination of the drugs Acetaminophen and Hydrocodone, and is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601006.html

[3]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

scaffolds; should avoid concentrated exposure to vibration, the hazards of moving and dangerous machinery; and even moderate exposure to unprotected heights. (Tr. 43-44). Dr. McGowen testified that such an individual could not return to any of plaintiff's past relevant work. (Tr. 44). Dr. McGowen testified that such a person could work as a parking attendant/parking enforcement officer or gate guard, classified as light work. (Id.) The ALJ then asked Dr. McGowen to assume that the hypothetical individual could lift ten pounds occasionally; less than ten pounds frequently; stand or walk for two hours out of eight; and sit for six hours out of eight, with all other factors the same as the preceding hypothetical. (Tr. 45). Dr. McGowen testified that such an individual could work as a surveillance systems monitor, and telephone solicitor. (Id.) Dr. McGowen testified that if the hypothetical individual was limited in her ability to get to work, there would be no jobs she could perform. (Tr. 46). Dr. McGowen testified that the mental impairments to which plaintiff testified would preclude working. (Tr. 46-47).

B. <u>Medical Records</u>[4]

The record reflects that plaintiff saw Jerome Williams, M.D., on May 16, 2000 with complaints of chronic anxiety and

---

[4]The Administrative Transcript contains medical information predating plaintiff's alleged onset date. These records will be included in the following summary of the medical records.

migraine headaches. (Tr. 225). In 2001, she reported injuring her lower back at work, and receiving care from a workers' compensation doctor. (Tr. 224). In April and May of 2001, she reported that she could not stand very long, and could not do physical therapy exercises, but continued to work. (Id.) On June 6, 2001, she reported that she had difficulty getting up in the morning. (Tr. 223). On July 17, 2001, she reported that she had been moved to the third shift, which she did not want. (Id.) In August of 2001, it appears that plaintiff reported that her back was better, but these records are largely illegible. (Tr. 222). On September 19, 2001, plaintiff saw Dr. Williams with complaints of lower and mid back pain, and Dr. Williams imposed restrictions on plaintiff's lifting and standing. (Tr. 221). On October 22, 2001, plaintiff saw Dr. Williams and reported that she was still unhappy with how she was being treated at work. (Id.) On November 29, 2001, she told Dr. Williams that her back was no better, and in January of 2002, Dr. Williams discussed with plaintiff the results of an MRI, and on February 20, 2002, plaintiff told Dr. Williams that she could not walk due to back pain. (Tr. 220). On February 21, 2002, plaintiff reported awakening with low back pain, and was observed to be tearful. (Tr. 219). Plaintiff back was better on March 5, 2002. (Id.) On May 29, 2002, plaintiff reported that she had quit her "second job," and was still on light duty at her security job. (Tr. 218). On July 24, 2002, plaintiff informed Dr. Williams that there were many personnel changes occurring at her job, and that

her medical restrictions were not being followed. (Id.) She reported being happy about recent weight loss. (Id.)

On September 6, 2002, plaintiff visited the Washington University School of Medicine, Department of Psychiatry, and was evaluated by Melissa Swallow, M.D. (Tr. 290-93). Dr. Swallow noted that plaintiff presented with symptoms of depression. (Tr. 290). Dr. Swallow noted that plaintiff denied any prior psychiatric care before 1989, when plaintiff was involved in a car accident and sustained facial injuries, and was prescribed Tranxene for anxiety.[5] (Id.) Plaintiff reported that, in 1998, she was working for the Housing Authority as a Public Safety Officer, and was involved in a shootout which left a co-worker paralyzed, and which caused her to suffer leg and back injuries, which have resulted in chronic pain. (Id.) Plaintiff reported that, following this incident, her employer referred her to Provident Counseling, where she reported symptoms of insomnia, irritability, mood swings, disrupted eating patterns, and poor concentration, as well as flashbacks of the incident. (Id.) Plaintiff was later referred to a psychiatrist who treated her with Prozac,[6] which helped her condition. (Tr. 290). Plaintiff reported that she continued to see this psychiatrist until his death in 2001, at

_____

[5]Tranxene, or Clorazepate, is used to relieve anxiety. It also is used to control agitation caused by alcohol withdrawal as well as seizures. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682052.html

[6]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a689006.html

which time she stopped taking the medication and sought no further treatment until the present date. (Id.)

Plaintiff reported that, one year prior to this visit, she had returned to Provident Counseling for what she described as increasing stress at work, resulting from feelings of being treated unfairly. (Id.) It is indicated that plaintiff presented to Dr. Swallow because her insurance changed, and she could not longer be seen at Provident Counseling. (Id.) Plaintiff reported feeling stressed and depressed. (Tr. 290). She reported being aggravated at work when people commented on her mood swings, and felt socially withdrawn and depressed. (Id.) She reported erratic sleep and appetite, and poor concentration. (Id.) She denied suicidal plan or intent, and stated that, while she owned a gun, it was locked and she did not know where the key was. (Tr. 290-91).

Plaintiff reported taking Vicodin, Celebrex,[7] Tranxene, and Topamax.[8] She reported that she had worked for the Missouri Department of Corrections for the past five years, and stated that she smoked approximately five cigarettes per day. (Tr. 291).

Upon examination, Dr. Swallow noted that plaintiff was

_____

[7]Celebrex, or Celecoxib, is used to relieve pain, tenderness, swelling and stiffness caused by various forms of arthritis, and pain from other causes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699022.html

[8]Topamax, or Topiramate, is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html

tearful at times, but would brighten appropriately. (Tr. 291-92).
Plaintiff expressed hope for the future, and reported that she had
a support system with her family; a stable residence; and a job.
(Tr. 292).

Dr. Swallow noted that plaintiff's symptoms seemed to
respond to Prozac, which plaintiff tolerated but had not taken
since February 2001. (<u>Id.</u>) Dr. Swallow assessed plaintiff as
having a single, moderate episode of major depressive disorder, and
a history of post-traumatic stress disorder and prescribed Prozac.
(<u>Id.</u>)

On October 30, 2002, plaintiff saw Dr. Swallow and
reported that she was doing "ok" but wanted her medication dosage
increased. (Tr. 285). Plaintiff indicated that she was excited
about the potential of getting a particular job transfer. (<u>Id.</u>)
Dr. Swallow increased plaintiff's Prozac dosage. (<u>Id.</u>) Dr.
Swallow noted that plaintiff's condition was "mild" and that
outpatient management was appropriate. (Tr. 287). Dr. Swallow
instructed plaintiff to return in four weeks, but plaintiff did not
do so. (<u>Id.</u>)

Dr. Williams's records reflect a Vicodin prescription in
November of 2002. (Tr. 217).

On January 21, 2003, plaintiff returned to Dr. Swallow
and reported that she was "hanging in there," but had a hard time
over the holidays and gained 30 pounds. (Tr. 284).

On January 27, 2003, plaintiff saw Dr. Williams and

reported that she was off Celebrex. (Tr. 217). She was observed to move slowly off the table. (Id.) She reported sleeping better. (Id.) Her back was tender over L4 and L5, and straight leg raise was positive on the right at 45 degrees. (Id.)

Dr. Williams's records reflect that, between June 3, 2003 and October 2003, plaintiff had complaints of knee pain and received medication refills. (Tr. 216).

On January 8, 2004, plaintiff saw Abdullah Nassief, M.D., a neurologist, with complaints of low back pain and bilateral knee pain. (Tr. 207). Plaintiff reported taking Topamax, Celebrex, Flexeril, Vicodin, Cloraz Depot,[9] and Prozac, stating that this regimen had been helpful for pain, but that she had been having severe pain in her right heel that was worse with weight-bearing. (Id.) She stated that she continued to smoke, and engage in unhealthy eating habits. (Id.) She reported that her mood was better, and had no musculoskeletal complaints other than right heel pain. (Id.) She had bilateral knee crepitations, but full strength bilaterally in her upper and lower extremities. (Tr. 208). Straight-leg raising elicited low back pain, but no radiation down the leg. (Tr. 209). The impression was lumbago, possible sacral radiculopathy, depression, knee pain, and a probable right heel bone spur. (Id.)

On January 13, 2004, plaintiff saw Dr. Williams and

---

[9]Clorazepate is used to relieve anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682052.html

reported that she was going to pain management, and was unhappy with recent weight gain. (Tr. 216). She complained of right heel pain. (Id.) On February 26, 2004, she reported having jury duty, and her chief complaint was noted as "discuss papers, sore throat." (Id.) On April 7, 2004, she reported that she had not worked since April 1, and complained of right foot and low back pain. (Tr. 215). She indicated she was trying to get a job transfer. (Id.)

On April 24, 2004, plaintiff saw Veda Lewis-Simmons, D.P.M., a podiatrist, who diagnosed plantar fasciitis in plaintiff's right foot, and injected the heel with a steroid and local anesthetic. (Tr. 199). Plaintiff returned on May 8, 2004, with complaints of an ankle sprain, and again received injections. (Tr. 198).

X-rays of plaintiff's right heel, taken at Forest Park Hospital on May 24, 2004, revealed small bilateral heel spurs. (Tr. 234).

Plaintiff returned to Dr. Lewis-Simmons on May 29, 2004 with complaints of foot pain she related to work, and explained that she had a "lawyer on her case." (Tr. 198). She again received injections, and Dr. Lewis-Simmons instructed her to return in two weeks for follow-up. (Id.) It does not appear that plaintiff ever returned.

On June 16, 2004, plaintiff saw Dr. Williams and complained that she had sprained her ankle on the job, and that her podiatrist had diagnosed heel spur. (Tr. 215). On July 8, 2004,

she complained of aching in her whole body, and swelling in both feet. (Id.)

On July 28, 2004, plaintiff saw Dr. Nassief with complaints of left flank pain, and low back pain. (Tr. 204). Plaintiff advised that she had a urinary tract infection that was treated with antibiotics, and that she later developed low back pain for no apparent reason. (Id.) She denied injury to her back, but reported urinary symptoms. (Id.) Plaintiff reported that she continued to smoke and have an increased appetite. (Id.) Plaintiff's only other musculoskeletal complaint was right heel pain, and she also complained of "feeling down." (Tr. 204). Physical and neurological examinations were normal, and plaintiff had normal muscle tone and bulk, and full strength in her upper and lower extremities bilaterally. (Id.) She was tender in her left flank. (Tr. 206). Dr. Nassief was concerned about whether plaintiff's current condition represented a complicated urinary tract infection or a kidney infection, and further work-up was planned. (Id.)

In August of 2004, plaintiff saw Dr. Williams and stated she was unhappy with her podiatrist's recommendations. (Tr. 214). She was tearful, and could not bear weight on her right foot. (Id.)

On September 3, 2004, plaintiff saw John Metzler, M.D., with complaints of bilateral foot pain. (Tr. 255). Plaintiff had been referred to Dr. Metzler by Dr. Williams. (Id.) Plaintiff

described pain beginning in 2003 and worsening since then, and attributed her pain to her work. (Id.) Dr. Metzler examined plaintiff and opined that her symptoms were related to plantar fasciitis, and recommended that plaintiff use a walker boot. (Tr. 256-57).

On September 14, 2004, Dr. Williams observed that plaintiff was wearing a boot (presumably the walker boot Dr. Metzler recommended). (Tr. 214).

Plaintiff returned to Dr. Metzler on January 31, 2005 and reported that she had been using the boot, and that her symptoms were improved, but that she still had severe right heel pain. (Tr. 253). Dr. Metzler discussed proper footwear and orthopedic shoe inserts with plaintiff, and released her to work full duty, with the notation that she should sit for 15 minutes per hour if her pain became severe. (Id.)

On May 3, 2005, plaintiff saw Dr. Williams with complaints related to a bladder infection. (Tr. 213). She continued to see Dr. Williams with complaints of back aches, elevated blood pressure, right heel pain, and headaches through August 16, 2005. (Id.) On September 6, 2005, plaintiff saw Dr. Williams and stated that she was unable to work. (Tr. 212). She reported that she was in the process of adopting her nephew. (Id.) She complained of pain in both knees, ankles, and back, and it was noted that she was to see a pain management doctor. (Id.)

On September 19, 2005, plaintiff saw Dr. Nassief with

complaints of low back pain and left flank pain. (Tr. 201). She brought her nephew with her, and reported that she planned to adopt him. (Id.) She reported that her mood was better. (Id.) Physical and neurological were unremarkable. (Tr. 202).

On October 12, 2005, plaintiff saw Dr. Williams and reported that she had fallen at home on October 2, and that her back had given out. (Tr. 212). She reported low back pain with radiation in both legs. (Id.) Dr. Williams wrote, "reviewed Dr. Nassief's report did not see pain management." (Id.) X-rays of plaintiff's lumbar spine were taken on this date at St. Alexius Hospital, and were within normal limits. (Tr. 229).

On October 22, 2005, plaintiff saw Dr. Metzler with complaints of severe, debilitating pain in her lumbar spine which had become progressively more severe in the last year. (Tr. 251). She complained of "vague diffuse" leg pain, as well as a sensation that her knees were "giving out." (Id.) Dr. Metzler writes: "[s]everal times, she seemed to relate her symptoms to an accident in 1989, although she reports her pain did not begin immediately after this but she believes it may now be manifesting itself." (Id.) Upon exam, plaintiff was tearful, and reported pain with lumbar flexion and extension, with full strength throughout both lower extremities. (Id.) Passive and active straight leg raise produced back pain. (Tr. 251). Dr. Metzler noted that plaintiff requested nerve conduction studies, and that he ordered them pursuant to her request. (Tr. 252).

Dr. Metzler noted that a recent MRI of plaintiff's thoracic and lumbar spine revealed mild degenerative changes at L5-S1, which was interpreted as epidural lipomatosis (fat deposits on or outside the lining of the spine) diffusely from T2 through the lower lumbar spine. (Id.) Dr. Metzler assessed diffuse spinal pain, and degenerative disc disease at L5-S1, and recommended physical therapy and aquatic therapy. (Tr. 251-52).

On November 9, 2005, an MRI of plaintiff's spine showed "minimal" facet arthropathy, and "no evidence of central canal compromise or neural foraminal stenosis." (Tr. 276).

On November 22, 2005, Dr. Metzler prescribed aquatic therapy, indicating that plaintiff had mild degenerative joint disease of the thoracic and lumbar spine. (Tr. 267).

On December 21, 2005, nerve conduction studies, performed at plaintiff's request, of plaintiff's lower extremities were normal. (Tr. 243). A bone scan, performed on December 29, 2005 at Barnes Jewish Hospital, was interpreted by Tom R. Miller, M.D. as revealing findings that were likely consistent with degenerative change in the knees, ankles and feet, but was otherwise normal, including plaintiff's spine. (Tr. 274). Dr. Miller noted that the scan revealed no explanation for plaintiff's back pain. (Id.)

Dr. Williams's records include notations of prescriptions for Flexeril, Celebrex, and Vicodin from late 2005 to early 2006. (Tr. 211). On January 4, 2006, plaintiff saw Dr. Williams with complaints that she was "sick." (Tr. 211). She indicated she was

to do "water therapy." (Id.)

On February 13, 2006, plaintiff returned to Dr. Swallow.
(Tr. 282). As plaintiff's chief complaint, Dr. Swallow noted that
plaintiff said, "I need to see you." (Id.) Dr. Swallow noted that
she had not seen plaintiff in three years. (Id.) Plaintiff
reported continued depression, medical issues, weight gain, pain
and psychosocial stressors, indicating that she had lost her job
and had a harassment and disability lawsuit pending. (Id.) She
was taking Prozac, but when Dr. Swallow suggested she switch,
plaintiff stated that Prozac really helped her, and would consent
to Prozac only. (Tr. 282). Plaintiff's Prozac dosage was
increased.

In a questionnaire dated March 6, 2006, Dr. Metzler
indicated that plaintiff had reduced back flexion, and normal
strength and reflexes, and did not require an assistive walking
device. (Tr. 241). Dr. Metzler wrote that plaintiff had "diffuse
spinal pain" at L5-S1; degenerative disc disease; and plantar
fasciitis. (Id.) He noted that, on her most recent exam, she was
tearful, and had pain with lumbar flexion but normal strength and
reflexes. (Id.) He wrote that plaintiff's limitations were based
on her complaints of severe pain, and that plaintiff reported
severe pain at rest and with any activity. (Id.)

On April 6, 2006, plaintiff returned to Dr. Swallow,
stating "I have a hard time." (Tr. 280). Dr. Swallow noted that
plaintiff had missed her last appointment. (Id.) Plaintiff

reported that her weight and pain caused her trouble in making appointments, but that the increase in Prozac helped her. (<u>Id.</u>) Again, Dr. Swallow offered plaintiff different antidepressants, but plaintiff insisted that Prozac helped her and wanted to continue it. (<u>Id.</u>)

On May 9, 2006, Examiner B. Poskin completed a Physical Residual Functional Capacity Assessment. (Tr. 308-15). After considering plaintiff's medical history, the examiner opined that plaintiff could lift twenty pounds occasionally and ten pounds frequently; stand, walk and sit for six out of eight hours; push and pull without limitation; frequently climb and balance; and occasionally stoop, kneel, crouch, and crawl. (Tr. 309-10). The examiner also opined that plaintiff should avoid concentrated exposure to vibration and hazards such as machinery and unprotected heights, but that plaintiff had no other environmental limitations. (Tr. 312). The examiner partially credited plaintiff's symptoms of being unable to stand too long to cook meals, and needing help with personal care, along with her complaints of severe pain on all postural movements. (Tr. 313).

On May 2, 2006, Judith A. McGee, Ph.D., completed a Psychiatric Review Technique form. (Tr. 294-). Dr. McGee opined that plaintiff had affective disorders, but that her impairments were not severe. (<u>Id.</u>) She opined that plaintiff had mild limitations in her ability to maintain social functioning and concentration, persistence and pace, but no limitation in her

activities of daily living. (Tr. 304). Dr. McGee reviewed plaintiff's medical records, and noted that plaintiff reported that people said she had "multiple personalities" because she was mean, and that she was strange because she talked to herself. (Tr. 306). She noted that plaintiff reported sleeping most of the day, and that she had a short attention span and had trouble staying awake. (Id.) She noted that plaintiff reported being a "loner" and that she suffered from paranoia, inasmuch as she thought people were after her at night, and she heard things at night. (Id.) After reviewing plaintiff's medical records, Dr. McGee concluded that plaintiff had a non-severe psychiatric impairment. (Id.)

Also on May 2, 2006, plaintiff saw Denise Buck, M.D., and Dr. Buck noted that plaintiff weighed 293 pounds. (Tr. 317, 354). Dr. Buck noted that plaintiff reported having osteoarthritis, and that she was unemployed and "waiting for disability." (Id.) She complained of congestion in the past week that was not helped by over-the-counter medication. (Id.) She reported that she had gained a lot of weight lately, despite eating only once per day. (Id.) She reported that she did not feel depressed. (Tr. 318, 355). Upon exam, Dr. Buck found that plaintiff was morbidly obese, and that she had hypertension, gastroesophageal reflux disease ("GERD"), and degenerative joint disease/degenerative disk disease. (Id.)

On June 13, 2006, plaintiff saw Dr. Buck with complaints of back pain, and a cold with congestion. (Tr. 316, 353). She

-19-

reported that Vicodin and Flexeril helped her back pain but that she still felt pain. (Id.) She reported that her home was being foreclosed and she was sad. (Id.) Dr. Buck referred plaintiff to a pain specialist, and encouraged plaintiff to lose weight, continue physical therapy, continue taking Prozac, and return in two to three months. (Id.)

On July 18, 2006, plaintiff presented to the emergency room at St. Alexius Hospital with multiple complaints, including bilateral flank pain and soreness across her abdomen. (Tr. 329). She reported smoking one-half pack of cigarettes per day, and using marijuana twice per week. (Id.) Plaintiff also reported aching pain in her low and mid back which she characterized as a 10 out of 10 on a pain scale. (Tr. 330). She reported pain on this same level after being awakened from a sound sleep. (Id.) Plaintiff reported that she took Vicodin, and Celebrex for back pain. (Tr. 326). She stated that she had a "kidney infection" that "spread into (her) chest for the last two weeks," and reported terrible pain in her "torso," starting in her left flank and radiating into her scapular area. (Id.) She also complained of urgency of urination. (Tr. 330). A urinalysis was negative, and plaintiff was given Toradol. (Id.) It was noted that plaintiff's pain was decreased, and she was discharged to home ambulatory and in good condition. (Id.)

On August 5, 2006, chest x-rays taken at Forest Park Hospital showed normal heart size, and minimal congestion. (Tr.

321).

On September 5, 2006, Dr. Metzler completed a physical therapy referral form, indicating that plaintiff's diagnosis was back, knee and hip pain. (Tr. 347). He wrote that plaintiff's imaging studies were normal, and indicated that there were no medical precautions. (<u>Id.</u>)

On September 10, 2006, Dr. Buck completed a Physician's Statement for plaintiff to have disabled license plates and a disabled parking placard. (Tr. 195). As a reason therefor, Dr. Buck indicated that plaintiff could not walk 50 feet without stopping to rest. (<u>Id.</u>)

On September 12, 2006, plaintiff saw Dr. Buck for a check up, and noted her recent emergency room visit. (Tr. 352). She reported that "pain management" had told her she had rheumatoid arthritis. (<u>Id.</u>) She complained of urinary incontinence. (<u>Id.</u>) Her EKG and laboratory tests were normal, and she was given Detrol LA,[10] and Claritin D[11] for sinus trouble. (<u>Id.</u>)

On October 2, 2006, plaintiff's physical therapist recommended that plaintiff work on rising from sitting to standing 20 times daily, and perform a variety of other exercises. (Tr.

---

[10]Detrol LA, or Tolterodine, is used to relieve urinary difficulties, including frequent urination and the inability to control urination. <u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699026.html</u>

[11]Claritin D, or Loratadine, is used to temporarily relieve the symptoms of hay fever (allergy to pollen, dust, or other substances in the air) and other allergies. <u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697038.html</u>

339).

On October 12, 2006, plaintiff's physical therapist requested a walker for plaintiff. During plaintiff's hearing testimony, plaintiff indicated that she had requested the walker. (Tr. 37).

On July 23, 2007, plaintiff saw Dr. Buck with complaints of depression and crying, breast tenderness, and bloody stool. (Tr. 351). Plaintiff's exam was normal. (<u>Id.</u>) She was assessed with depression and chronic pain, and advised to continue her current medications, with emphasis on the importance of compliance. (<u>Id.</u>)

On February 12, 2010, the undersigned ordered the Commissioner to furnish the records referred to by the ALJ in the third paragraph of page 19 of the Administrative Transcript; specifically, the April 15, 2007 records from BJC Behavioral Health, and the September 18, 2007 emergency room records from St. Alexius Hospital. (Docket No. 24). On February 26, 2010, the Commissioner complied, submitting records documenting plaintiff's September 18, 2007 emergency room visit, and other records.[12] (Docket No. 25).

The St. Alexius records document that, on September 18, 2007, plaintiff presented to the emergency room of St. Alexius Hospital in ambulatory condition with complaints of low back pain

---

[12]Neither party was able to locate records documenting an April 15, 2007 visit to BJC Behavioral Health. (Docket No. 25).

and cold symptoms. (Tr. 431, 440). Plaintiff complained of mid back pain which she characterized as mild, and stated that it did not radiate. (Tr. 437). Plaintiff also complained of sinus congestion, but reported no other symptoms, and stated that the severity of her back pain at worst was mild. (Tr. 437, 440).

Upon exam, plaintiff was not tender in her back, and there were no abnormal findings. (Id). Her gait was noted to be steady. (Id.) X-ray of the lumbar spine was negative. (Tr. 446). Plaintiff was discharged in ambulatory condition. (Tr. 443).

## III.     Evidence Before the Appeals Council

In denying plaintiff's request for review, the Appeals Council indicated that it received and reviewed the following evidence, and concluded that it provided no basis for changing the ALJ's decision.

On May 27, 2008, plaintiff was seen in the emergency room of Barnes Jewish Hospital with complaints of generalized abdominal pain, nausea, vomiting, constipation, and a sore throat. (Tr. 388). She denied musculoskeletal complaints, but a later notation indicates that plaintiff asked for a pain shot due to low back pain. (Tr. 396, 399). It was noted that plaintiff was diagnosed with abdominal pain, but that the cause had not been determined. (Tr. 411). It was noted that plaintiff was "histronic" and requesting pain medication, and that she appeared "mildly ill."

(Tr. 400).  Plaintiff exhibited some soft tissue tenderness in her back.  (<u>Id.</u>)  Abdominal radiography was negative.  (Tr. 415).  It was opined that plaintiff's illness did not seem to represent a dangerous condition, or necessitate hospitalization or surgery, and plaintiff was discharged.  (Tr. 411).

On June 1, 2008, plaintiff visited the emergency room at Barnes Jewish Hospital with complaints of an episode of bloody stool.  (Tr. 367, 372-74).  Plaintiff was advised to quit smoking.  (Tr. 373).  Plaintiff denied musculoskeletal complaints.  (<u>Id.</u>)  Physical exam was negative, and it was noted that plaintiff moved all of her extremities well.  (<u>Id.</u>)  Plaintiff stated that she was "addicted" to Percocet,[13] which she stated she had been taking for ten years.  (Tr. 374).  She was diagnosed with constipation and a rectal fissure, and discharged.  (Tr. 378).

## IV.    The ALJ's Decision

ALJ Schum determined that plaintiff met the insured status requirements through December 31, 2010.  (Tr. 11, 13).  He determined that plaintiff had not engaged in substantial gainful activity since May 31, 2005, the alleged onset date.  (Tr. 13).  The ALJ determined that plaintiff had the severe impairments of degenerative disc disease and degenerative joint disease of the

---

[13]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601007.html

lumbar spine, and obesity. (Id.) The ALJ analyzed plaintiff's allegations of asthma, hypertension, and depression, and found them to be non-severe. (Tr. 13-14). The ALJ determined that plaintiff did not have an impairment, or combination of impairments, of listing-level severity. (Tr. 15).

The ALJ concluded that plaintiff could not perform her past relevant work. (Tr. 20). The ALJ determined that plaintiff retained the residual functional capacity to perform light work, except that she required a sit/stand option, and the option to use a cane to ambulate when necessary. (Tr. 15). The ALJ determined that plaintiff could occasionally climb stairs and ramps, but never ropes, ladders or scaffolds. (Id.) Finally, the ALJ determined that plaintiff must avoid concentrated exposure to vibration and dangerous moving machinery, and even moderate exposure to unprotected heights. (Tr. 15).

Citing 20 C.F.R. §§ 404.1529 and 416.929; Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984); and all of the relevant factors therefrom, the ALJ analyzed the credibility of plaintiff's subjective complaints and discredited her allegations of pain and other symptoms precluding all work. (Tr. 15-20). The ALJ concluded that, based upon vocational expert testimony, she was capable of making an adjustment to other work at step five of the sequential evaluation process. (Tr. 21).

## V.  Discussion

To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health and Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  <u>See</u> 42 U.S.C. §§ 423(d)(1)(A); 1382c (a)(3)(A) (defining "disability" for DIB and SSI purposes).  The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  <u>Id.</u> It further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42.  The Commissioner begins by considering the claimant's work activity.  If the claimant is engaged in substantial gainful activity, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities.  If the claimant's impairment is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform her past relevant work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform.  Pearsall, 274 F.3d at 1217; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young

o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

    1. The credibility findings made by the ALJ;

    2. The plaintiff's vocational factors;

    3. The medical evidence from treating and consulting physicians;

    4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

    5. Any corroboration by third parties of the plaintiff's impairments; and

    6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139

-28-

F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992) (citing <u>Cruse</u>, 867 F.2d at 1184).

In the case at bar, plaintiff argues that the ALJ's RFC determination is in error because he failed to articulate a legally sufficient rationale for disregarding plaintiff's mental impairments, and because the ALJ failed to consider evidence of record indicating that plaintiff has a chronic pain condition. Plaintiff also suggests that the ALJ failed to point to any medical evidence in the record supporting his conclusions regarding plaintiff's physical and mental limitations.[14]

Plaintiff also challenges the ALJ's credibility determination, arguing that the ALJ found no objective support for plaintiff's subjective complaints despite the evidence in the record that plaintiff had a chronic pain disorder, suggesting that the ALJ did not fully understand the nature of a pain disorder. Plaintiff also suggests that the ALJ improperly considered evidence of her financial motivation. Finally, plaintiff alleges that, because the hypothetical the ALJ posed to the vocational expert did not capture the concrete consequences of plaintiff's impairments, the VE's testimony cannot be considered substantial evidence to support the ALJ's decision. In response, the Commissioner contends

---

[14]Plaintiff also includes citations to case law addressing the issues of the ALJ's duty to ensure a fully and fairly developed record, and to re-contact treating and/or examining physicians under certain circumstances. However, plaintiff does not specify the areas of the record requiring further development, nor does she indicate which physician the ALJ should have re-contacted.

that the ALJ's decision is supported by substantial evidence on the record as a whole. For the following reasons, the Commissioner's arguments are well-taken.

A.   Credibility Determination

The undersigned will first address plaintiff's allegations of error in the ALJ's credibility determination. See Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217) (before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints). Plaintiff contends that the ALJ impermissibly dismissed plaintiff's complaints due to the lack of supporting medical evidence, despite the fact that the record demonstrated that plaintiff had been referred for pain management and had a chronic pain condition. In response, the Commissioner contends that the ALJ properly analyzed plaintiff's credibility, noting many inconsistencies in the record supporting his decision. For the following reasons, the Commissioner's argument is well-taken.

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged impairments. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 1321-22. In Polaski, the

Eighth Circuit addressed this difficulty, and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A)). An ALJ may not disregard subjective complaints merely because there is no evidence to support them, but may disbelieve such allegations due to "inherent inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see also Polaski, 739 F.2d at 1322 (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the

evidence as a whole).

The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision should be upheld. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, having cited <u>Polaski</u> and the corresponding Regulations, and having cited the relevant factors therefrom, the ALJ analyzed all of the evidence of record, and considered its impact upon plaintiff's allegations of mental and physical symptoms precluding all work. Having fully discussed plaintiff's complaints and her medical treatment, the ALJ noted that, during the hearing, plaintiff appeared to be in an altered state, or "using an exaggerated technique."[15] (Tr. 16). The ALJ also noted that plaintiff appeared at the hearing wearing hospital

---

[15]As the ALJ noted, the record reflects that plaintiff repeatedly denied that her medication caused side effects. It therefore does not appear that plaintiff's behavior could be due to medication side effects. It does not seem that such observations could be due to medication side effects, inasmuch as the record indicates that plaintiff repeatedly denied side effects. The ALJ noted as much in his decision. (Tr. 16).

gowns and using a wheelchair, despite the fact that Dr. Metzler opined that plaintiff did not need any assistive devices.  It was proper for the ALJ to consider plaintiff's hearing demeanor in discrediting her allegations.  Kirby v. Astrue, 5500 F.3d 705, 708 (8th Cir.  2007) (citing Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations.")

In addition, although plaintiff in this case argues that the walker was prescribed for her, plaintiff testified that she had specifically requested it.  It was proper for the ALJ to consider such inconsistencies in discrediting plaintiff's allegations of extremely limited mobility.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (concluding that an ALJ's credibility determination was supported by substantial evidence where the ALJ recited the appropriate factors, and noted inconsistencies in the record such as the lack of physician-ordered functional restrictions).

The ALJ also noted that plaintiff did not seek treatment for her problems on a regular, sustained basis.  The ALJ noted that plaintiff sought treatment for complaints of low back pain as early as January 2, 2001, and that she saw Dr. Lewis-Simmons for heel pain, but did not return for follow-up as instructed by Dr. Lewis-Simmons.  The ALJ noted that plaintiff's mental health treatment was inconsistent, inasmuch as she began seeking mental health

treatment in 2002 after the aforementioned work incident, but stopped when her therapist died. The ALJ also noted that plaintiff told Dr. Swallow in October of 2002 that she was doing ok and needed more medication, and then failed to return in four weeks as directed. The ALJ also noted that plaintiff stopped seeing Dr. Swallow, but returned, after a three-year hiatus, shortly after filing her DIB and SSI applications. The lack of sustained, regular medical treatment is inconsistent with allegations of mental and physical symptoms precluding all work, and it was proper for the ALJ to consider the fact that plaintiff failed to maintain a consistent pattern of medical and psychological treatment in making his credibility determination. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(plaintiff failed to maintain consistent treatment pattern for alleged mental impairments); Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997)(paucity of medical treatment inconsistent with subjective complaints of severe pain); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997)(failure to seek medical assistance contradicts subjective complaints of disabling conditions); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)(while not dispositive, the failure to seek treatment may indicate the relative severity of an alleged medical problem).

The ALJ also noted that Dr. Metzler told plaintiff that she was not a surgical candidate, and instead recommended therapy. Conservative or minimal medical treatment militates against a

finding of disability.  <u>Loving v. Dept. Of Health and Human Services</u>, 16 F.3d 967, 970 (8th Cir. 1994).

In addition, the ALJ noted plaintiff's testimony that it was untrue that she had not seen Dr. Swallow between 2003 and 2006, despite the fact that Dr. Swallow's records indicated a three-year hiatus.  The ALJ also noted plaintiff's testimony that that was the reason she was upset with those doctors and therefore decided to switch all of her medical care to BJC, when in fact Dr. Swallow was indeed a BJC physician.  The ALJ also noted that plaintiff was apparently dishonest with Dr. Buck, inasmuch as she told Dr. Buck that her past medical history included osteoarthritis, when in fact she had not been diagnosed with any form of arthritis.  The undersigned also notes that plaintiff testified that she had "osteo-rheumatoid arthritis" that caused her daily pain, despite the lack of such a diagnosis in her medical records.  (Tr. 36-37). It was permissible for the ALJ to consider that plaintiff may not have been consistently truthful.  <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 818 (8th Cir. 2003)(An ALJ may discount a claimant's allegations if there is evidence that he is a malinger or was exaggerating symptoms for financial gain); <u>see also</u> <u>Fitzsimmon v. Mathews</u>, 647 F.2d 862, 863-64 (8th Cir. 1981)(an ALJ may properly consider a claimant's lack of candor in assessing her credibility).

The ALJ noted that plaintiff reported that Prozac "really helped" her, and that she was unwilling to change antidepressants. (Tr. 18).  It is proper for an ALJ to consider, as one factor

detracting from a claimant's credibility, the fact that her impairments are controlled with medication. Fenton v. Apfel, 149 F.3d 907, 911-12 (8th Cir. 1998).

The ALJ also noted that plaintiff worked subsequent to the date she alleges she was disabled from all work. Indeed, the record reflects that plaintiff sought treatment for mental health issues and back pain during her working years, and there is no evidence in the record that those conditions have since worsened. A condition that was not disabling during working years, and has not worsened, cannot be used to prove a present disability. Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

The ALJ also noted that plaintiff applied for unemployment benefits, and that plaintiff testified that, when she applied, she represented herself as ready, willing and able to work, and also that she said she would be able to work in a job that allowed her to sit. The ALJ found this inconsistent with plaintiff's allegation that her activities of daily living were as limited as she alleged. Indeed, plaintiff's application for, and receipt of, unemployment compensation benefits adversely affects her credibility, inasmuch as she represented herself as ready, willing and able to work, while in the present proceedings, she claims to be completely disabled from all work. See Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (unemployment recipient must sign documents stating she is capable of work and is seeking

-36-

work); see also Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991) (receipt of unemployment benefits detracts from credibility).

The ALJ also noted that, despite all of the conditions plaintiff alleged rendered her completely disabled, the record indicated that plaintiff was in the process of adopting her nephew. Indeed, the record reflects that plaintiff shared these plans with both Dr. Williams and Dr. Nassief. The ALJ concluded that it was inconsistent that one so physically and mentally limited as to be unable to work, or to cook or care for a home, would agree to adopt and care for a child.

As an additional factor supporting his finding that plaintiff was not credible, the ALJ noted that the record contained no objective medical evidence supporting plaintiff's claims of disabling mental and physical symptoms. The ALJ noted that nerve conduction studies, which were performed at plaintiff's request, were negative. The ALJ also noted that Dr. Metzler ordered a bone scan (which he predicted would be "completely normal") that was interpreted as normal, and which provided no basis for plaintiff's symptoms. The ALJ noted that Dr. Nassief reported normal clinical findings, including a normal gait. The ALJ noted that spine x-rays taken in October 2005 and September 2007 were normal, and that an MRI of plaintiff's spine in November of 2005 showed only "minimal" facet arthropathy. The ALJ also noted that, when plaintiff saw Dr. Swallow after a three-year hiatus, she mostly seemed to vent about job problems, and was uninterested in changing medications because

the antidepressants she was using were working well.

The ALJ also noted that he had left the record open at the conclusion of the hearing to allow counsel to submit additional medical records, and that counsel submitted records from BJC Behavioral Health dated April 15, 2007, and emergency room records from St. Alexius Hospital dated September 18, 2007. (Tr. 19). In his decision, the ALJ noted that the April 15, 2007 records showed that plaintiff was denied mental health services because her problems appeared to be medical issues. (Id.) The ALJ also noted that the September 18, 2007 records from St. Alexius Hospital showed that plaintiff reported to the emergency room on that date with complaints of back pain and cold symptoms. (Id.) The ALJ noted that there was no observation that plaintiff either used or needed to use a wheelchair, and that plaintiff's gait was observed to be steady. (Id.) The ALJ noted that plaintiff was discharged to home in ambulatory condition. (Tr. 19). After noting both the April 15 and the September 18 records, the ALJ wrote, "[t]hese recent records significantly conflict with the testimony presented by the claimant at the hearing." (Id.)

As noted above, neither party was able to locate BJC Behavioral Health records documenting a visit of April 15, 2007. However, discounting the ALJ's mention of the April 15, 2007 records as being inconsistent with plaintiff's hearing testimony, the undersigned notes that the September 18, 2007 St. Alexius Hospital records do "significantly conflict" with plaintiff's

hearing testimony to the extent the ALJ noted, inasmuch as plaintiff reported her symptoms as mild; did not complain of psychiatric complaints; and was observed to have a steady gait and to neither use nor need a wheelchair. Therefore, even though there is no support for the ALJ's mention of April 15, 2007 records as conflicting with plaintiff's testimony, the September 18, 2007 records adequately and accurately support the ALJ's conclusion, and the undersigned concludes that the record as a whole therefore contains substantial evidence supporting that conclusion.[16]

As plaintiff correctly notes, an ALJ may not discredit her allegations of totally disabling symptoms solely because the objective medical evidence fails to support them. However, while the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C .F.R. § 404.1529(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles v. Sullivan</u>, 902 F.2d 657, 659 (8th Cir. 1990)(ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to

---

[16]In addition, the undersigned notes that plaintiff, in her brief, makes no specific mention of the ALJ's reference to the April 15, 2007 records.

consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination). A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability; rather, they must be supported by "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis, 477 F.3d at 1042 (citing 42 U.S.C. § 423(d)(5)(A)).

While plaintiff complains that the ALJ discredited her testimony despite evidence that she had a pain disorder, the ALJ noted that such evidence was based solely upon plaintiff's complaints, inasmuch as Dr. Metzler ascribed plaintiff's pain to her own assertions after his testing revealed no cause for her back pain. As the Commissioner correctly notes, the "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg, 354 F.3d at 713-14. The record in the case at bar is replete with medical evidence contrary to plaintiff's testimony about her physical and mental symptoms.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record

as a whole.  <u>Battles</u>, 902 F.2d at 660.  Because the ALJ considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for a good reason, his credibility determination is entitled to deference.  <u>Hogan</u>, 239 F.3d at 962.

      B.   <u>RFC Determination</u>

Plaintiff next challenges the ALJ's RFC determination, arguing that he erroneously determined that her alleged mental impairment was not disabling.  Plaintiff also argues that the ALJ failed to point to any medical evidence supporting his RFC determination.  Plaintiff argues that she was referred for pain management services, and suggests that this contradicts the conclusion that she is capable of working.  Review of the decision reveals no error.

Residual functional capacity is what a claimant can do despite his limitations.  20 C.F.R. § 404.1545, 416.945; <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995); <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  <u>Id.</u>;

Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing her RFC. Goff, 421 F.3d at 790.

As discussed above, in analyzing plaintiff's allegations of a disabling mental impairment, the ALJ in this case noted that Dr. Swallow found that plaintiff's condition was mild. The ALJ also noted that plaintiff told Dr. Swallow that Prozac helped her symptoms, and that she was unwilling to try any other psychiatric medication. Impairments that are controllable with medication are not considered disabling. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); see also Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729 -730 (8th Cir. 2003) (citing Johnson, 240 F.3d at 1148) (impairments that are controllable by medication do not support a finding of total disability).

The ALJ also noted that plaintiff did not consistently seek treatment for psychological symptoms, inasmuch as there was a

three-year gap in plaintiff's treatment with Dr. Swallow, with plaintiff returning to Dr. Swallow shortly after filing her DIB and SSI applications. In general, the failure to obtain follow-up treatment, or to seek consistent medical treatment, indicates that a person's condition may not be disabling, or may be less serious than alleged. See Shannon, 54 F.3d at 487. This finding, combined with the ALJ's exhaustive evaluation of the record, supports the ALJ's RFC determination.

Plaintiff also contends that the ALJ failed to point to medical evidence supporting his conclusion. Plaintiff also directs the Court's attention to the fact that she was "prescribed a walker" in October 2006. (Docket No. 19 at 14). However, during plaintiff's administrative hearing, she testified that she requested that the walker be approved for her. (Tr. 36). Furthermore, as the Commissioner correctly notes, the ALJ in this case analyzed all of the medical evidence of record, and assigned significant limitations. The ALJ limited plaintiff to light work that permitted the use of a cane, despite the findings of Drs. Metzler and Nassief, discussed above, that plaintiff had full strength in her extremities; had a normal gait; and did not require an assistive device. The ALJ also found that plaintiff needed a job that allowed her to sit or stand, which was consistent with Dr. Metzler's January 2005 opinion that plaintiff could return to work full-duty, but should be allowed to sit for fifteen minutes each hour if her pain became severe. As noted above, while an ALJ must

determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863.

As noted above, the ALJ observed that plaintiff had been seeking treatment for back pain since 2001, and had sought mental health treatment since 2002. Since then, plaintiff has worked, and has also filed for unemployment compensation benefits, representing herself as ready, willing, and able to work, and there is no evidence in the record that any of her conditions have worsened. As noted above, impairments that are present during working years and have not worsened cannot be used to prove a present disability. <u>Naber</u>, 22 F.3d at 189 (citing <u>Dixon</u>, 905 F.2d at 238).

In addition, as discussed in detail above, the record simply contains no medical evidence supporting plaintiff's allegation that her impairments are totally disabling. While not dispositive, the foregoing supports the ALJ's conclusion that plaintiff is not disabled. <u>See</u> <u>Battles</u>, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time).

1. <u>Dr. Buck's Opinion</u>

Plaintiff contends that the ALJ erred by assigning little weight to the opinion Dr. Buck expressed on the handicapped parking permit application she completed for plaintiff on September 10,

2006, wherein she indicated the reason for the parking permit was that plaintiff was unable to walk fifty feet without stopping to rest.  Review of the ALJ's decision reveals no error.

An ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence in the record.  <u>Davidson v. Astrue</u>, 578 F.3d 838, 842 (8th Cir.  2009); <u>see</u> <u>also</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006); <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005).

In assigning little weight to Dr. Buck's opinion, the ALJ noted that Dr. Buck completed the parking permit application after having seen plaintiff on only two occasions.  Dr. Buck's opinion was therefore not necessarily due the deference ordinarily due a treating source.  <u>See</u> <u>Randolph v. Barnhart</u>, 386 F.3d 835, 840 (8th Cir.  2004) (physician's letter was not an opinion of a treating source because physician had only met with claimant on three prior occasions).

Furthermore, even if it could be said that the opinion Dr. Buck expressed on the parking application was the opinion of a treating source, the ALJ was entitled to assign it little weight because it was unsupported by Dr. Buck's own treatment records, and with other medical evidence in the record.  The ALJ noted that, when Dr. Buck completed the parking application, she did not have the benefit of any objective testing, such as radiological studies,

-45-

to support her conclusion.  In order to be entitled to deference, a treating physician's opinion must be well-supported by medically acceptable clinical and diagnostic testing.  Davidson, 578 F.3d at 842; Hacker, 459 F.3d at 937; Reed, 399 F.3d at 920.  The ALJ also noted that Dr. Buck's opinion was inconsistent with the treatment records of Drs. Nassief and Metzler.  Specifically, the ALJ noted that, five days before Dr. Buck completed the application, Dr. Metzler prescribed physical therapy for plaintiff, noting that she had no medical restrictions.  The ALJ also noted that Dr. Nassief had observed plaintiff to walk with a normal gait.  When a treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ is entitled to give it less weight.  Hogan, 239 F.3d at 961.  The ALJ concluded that the limitations Dr. Buck asserted qualified plaintiff for a handicapped parking placard were based solely on plaintiff's own assertions and, as noted above, there is evidence that plaintiff was less than honest with Dr. Buck.  The undersigned concludes that there was no error in the ALJ's treatment of Dr. Buck's opinion.

Finally, the undersigned notes that the administrative transcript includes records received and reviewed by the Appeals Council.  While plaintiff does not argue that this evidence provides any basis for changing the ALJ's decision, the undersigned notes that, when the Appeals Council considers new evidence, this Court must decide whether the ALJ's decision is supported by substantial evidence on the record as a whole, which now includes

-46-

that new evidence.  Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (citing Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000)). In the case at bar, considering the evidence received subsequent to the ALJ's decision and reviewed by the Appeals Council as part of the administrative record, the undersigned determines that substantial evidence supports the ALJ's decision.  As discussed above, the evidence the Appeals Council reviewed included two emergency room visits in May and June of 2008, during which plaintiff's chief complaints included abdominal pain, nausea, constipation, and bloody stool, and which reflect diagnoses of generalized abdominal pain, constipation, and anal fissure.  The records also reflect that plaintiff was discharged in ambulatory condition.  It certainly cannot be said that this medical information undermines the ALJ's decision.

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole, and that he properly disregarded the opinion Dr. Buck expressed on plaintiff's handicapped parking application.  The ALJ based his decision on all of the relevant, credible evidence of record, and properly weighed all of the evidence.  For the foregoing reasons, the undersigned recommends a finding that the ALJ's RFC determination is supported by substantial evidence on the

record as a whole.[17]

C.  Vocational Expert Testimony

Finally, plaintiff challenges the VE's testimony. Plaintiff argues that it cannot be considered substantial evidence to support the ALJ's decision because the ALJ's hypothetical questions failed to capture the concrete consequences of plaintiff's mental impairments, or her pain condition. Plaintiff also notes that, when the VE was asked to consider plaintiff's testimony, he concluded that plaintiff's mental impairment would preclude work. Plaintiff alleges no other error in the ALJ's hypothetical questions. Review of the decision reveals no error.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000)). As explained, supra,

_____

[17]The record in this case establishes that plaintiff is obese. Consistent with this, the ALJ wrote that he had reviewed the record and determined that plaintiff's obesity was a severe impairment, and also stated that he had considered all of plaintiff's impairments in combination. In reviewing the medical evidence of record, the ALJ made numerous references to plaintiff's obesity. Plaintiff alleges no error in the ALJ's decision related to obesity.
    Upon review, the undersigned concludes that the ALJ sufficiently reviewed the record, and referenced plaintiff's obesity in a manner sufficient to avoid reversal. Heino v. Astrue, 578 F.3d 873, 881-82 (8th Cir. 2009) (citing Brown ex rel. Williams v. Barnhart, 388 F.3d 1150, 1153 (8th Cir. 2004)(where the ALJ sufficiently reviewed the record and referenced the claimant's obesity, reversal is unnecessary). Because the ALJ specifically took plaintiff's obesity into account in his evaluation, reversal is unnecessary.

substantial evidence supports the ALJ's RFC and credibility determinations, and the ALJ properly considered and weighed Dr. Buck's opinion. The hypothetical questions he posed to the VE therefore included the mental conditions the ALJ found to be credible, and also included plaintiff's alleged pain condition, to the extent the ALJ found it credible. See Strongson v. Barnhart, 361 F.3d 1066, 1072-73 (8th Cir. 2004)(VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination). It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." Hunt, 250 F.3d at 625 (citing Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997)).[18]

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and it should therefore be affirmed. Because there is substantial evidence to support the decision, this Court may not reverse merely because substantial evidence may support a different outcome, or because another court could have decided the

---

[18]The undersigned notes that the ALJ in this case did not mention plaintiff's obesity in the hypothetical questions he posed to the VE. While plaintiff alleges no error based on this omission, the undersigned has nevertheless considered this issue, and has found no error, inasmuch as plaintiff makes no attempt to explain how including her obesity would have changed the hypothetical questions, nor does plaintiff allege that her obesity plays any role in her functioning. See Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (where the claimant made no attempt to explain how obesity would have changed the hypothetical questions posed to the VE, there was no error in the ALJ's failure to include obesity in those questions).

case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than March 12, 2010.  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of February, 2010.